NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2009
Decided June 18, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-3010

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

JEWELL G. HARRIS, SR.
    *Defendant-Appellant.*

Appeal from the United States District
Court for the Northern District of
Indiana, Hammond Division.

No. 06 CR 118

James T. Moody,
*Judge.*

**O R D E R**

The City of Gary, Indiana, christened a new stadium for its minor-league baseball team in 2002. A trucking company operated and partly owned by Jewell Harris billed the City just under $1.6 million for hauling away and disposing of dirt and debris excavated during site preparation for the stadium. Harris was sentenced to 71 months' imprisonment after a jury determined that his bills were fraudulent and found him guilty of mail fraud, wire fraud, and money laundering. Harris challenges only his prison sentence. We affirm the judgment.

The City broke ground on its new stadium in June 2001. Because the stadium site needed to be lowered about twelve feet, the City contracted with Rieth-Riley Construction

to excavate and lower the grade. Under that contract, Rieth-Riley was responsible for removing and disposing of all excavated material, mostly dirt and sand. Rieth-Riley subcontracted with Harris's company, Enterprise Trucking and Waste Hauling.

Enterprise hauled away the material from the excavation site. Although Rieth-Riley was already paying Enterprise as its subcontractor, Harris directed that his company's drivers stop at a scale and weigh every truckload before dumping it. The City had previously contracted with Enterprise and paid by the ton for hauling and disposing of construction and demolition debris. Although the last such contract between Harris and the City had by then expired, Enterprise exploited its prior dealings with the City by submitting to the City the weight receipts from the stadium loads with invoices for hauling and disposal. Under this scheme, Enterprise first collected from Rieth-Riley and then received almost $1.6 million from the City.

After the jury returned guilty verdicts on all but one count (for which the proof of mailing was deficient), the district court calculated Harris's imprisonment range by starting with a base offense level of 7, which applies to fraud offenses punishable by a statutory maximum term of imprisonment of 20 years or more. *See* U.S.S.G. § 2B1.1(a)(1)(B). The district court found that the loss was the entire amount that Enterprise received from the City, just under $1.6 million, and so the court added 16 levels, *see id.*§ 2B1.1(b)(1)(I), plus two more levels for Harris's leadership role, *see id.* § 3B1.1(c). Harris had no criminal history, so his total offense level of 25 yielded an imprisonment range of 57 to 71 months. *See* U.S.S.G. ch. 5, pt. A. The district court selected the high end of that range.

On appeal Harris argues that the district court made two errors in calculating his offense level. First, he insists that the court selected the wrong base offense level of 7. Second, he contends that the court overstated the fraud loss.

Beginning with the base offense level, Harris contends—and the government concedes—that the correct level was 6, not 7. Harris, though, did not object to the district court's determination, so our review is for plain error. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008). A sentence based on an incorrect guideline range affects substantial rights and can therefore be plain error requiring resentencing unless there is reason to believe that the error did not affect the district court's selection of a particular sentence. *United States v. Avila*, 557 F.3d 809, 822 (7th Cir. 2009).

The sentencing guidelines provide that the base offense level for fraud crimes should be 6, unless the maximum prison penalty for the crime is 20 years or more. U.S.S.G.

§ 2B1.1(a). When Harris was sentenced, the relevant statutory maximum for mail and wire fraud was 20 years, but only because Congress had increased these penalties in 2002. *See* Sarbanes-Oxley Act of 2002 § 903, 16 Stat. 745, 805 (codified as amended at 18 U.S.C. §§ 1341, 1343 (effective July 30, 2002)). At the time of the fraud, however, the maximum penalty was five years. 18 U.S.C. §§ 1341, 1343 (2000). (The maximum sentence for money laundering has remained unchanged at 10 years' imprisonment. 18 U.S.C. § 1957.) Thus, as the government concedes, the district court should have begun its calculation with a base offense level of 6, not 7.

But a remand is unnecessary if the error in calculation did not affect the selection of the sentence. *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). The district court's erroneous addition of a point under § 2B1.1(a)(1) was offset by the court's failure to follow U.S.S.G. § 2S1.1, the offense guideline applicable to violations of 18 U.S.C. § 1957. As the presentence report correctly notes, a sentencing court should determine the offense level for money laundering by first calculating the offense level for the underlying crime, if it can be determined. U.S.S.G. § 2S1.1(a)(1). In Harris's case, that should mean the correct base offense level is 6 (as explained above), with the appropriate levels added for the amount of the loss and Harris's leadership role. *See* U.S.S.G. § 2B1.1; *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009); *United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006); *United States v. Baretz*, 411 F.3d 867, 875-76 (7th Cir. 2005). But then § 2S1.1(b)(2)(A) instructs that one additional level be added for a conviction under § 1957. When § 2S1.1 was amended in 2001, the Sentencing Commission explained that "all direct money launderers will receive an offense level that is one to four levels greater than the Chapter Two offense level for the underlying offense, depending on the statute of conviction and sophistication of the money laundering offense conduct." U.S.S.G. app. C, Amendment 634; *see Hodge*, 558 F.3d at 637. The district court should have added the additional level to Harris's total, but did not. Consequently, the error in overstating the base offense level by one level was harmless, because the total offense level would have ended up at the same place.

As for the amount of loss, Harris admitted in the district court that Enterprise billed the City by sending invoices for services already paid for by Rieth-Riley. But the amount Enterprise received under its subcontract with Rieth-Riley was small—less than $100,000—and Harris contends that all of Enterprise's charges to the City above that amount were legitimate. The government counters that $1.6 million is the correct measure of the loss because all of the work Enterprise did at the stadium site was bought and paid for by Rieth-Riley.

We review a loss calculation only for clear error, so the defendant bears a heavy burden in showing that the district court's finding is "'not only inaccurate but outside the realm of permissible computations.'" *United States v. Peterson-Knox*, 471 F.3d 816, 822 (7th Cir. 2006) (quoting *United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000)).

Harris testified at sentencing that he was entitled to the majority of the funds because his prior contracts with the City authorized him to receive payment for hauling demolition debris. When construction began on the stadium site in June 2001, there were still buildings left to be demolished, and Harris contends that all of the invoices he submitted to the City were for hauling and disposing of demolition debris. At trial, however, the government presented evidence that the material hauled by Enterprise was not demolition debris (for which the company might have been entitled to disposal payments from the City) but excavation debris it was solely obligated to haul for Rieth-Riley. The government's expert, a retired IRS agent, testified that he analyzed all of Enterprise's billing records and concluded that all of the City's nearly $1.6 million in payments were related exclusively to excavation work at the stadium site, and that none of the money was for hauling and disposing of demolition debris. The former agent's testimony was consistent with the testimony of Enterprise's drivers, who all testified that they hauled excavation debris (i.e., dirt and sand). The district court's choice to credit the former agent and the drivers was not clearly erroneous.

**AFFIRMED**.